TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00204-CV






Charles Hull, Appellant


v.


Abel Dutch Vidaurri, Appellee






FROM TRAVIS COUNTY, COUNTY COURT AT LAW NO. 2,
HONORABLE ERIC SHEPPERD, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Charles Hull was involved in an automobile collision with Abel Vidaurri. Vidaurri
later sued Hull for injuries and property damage sustained as a result of the collision; however, Hull
was not served until several months after the statute of limitations had expired. At the conclusion
of the trial, the jury found that Vidaurri was diligent in his efforts to serve Hull and awarded
Vidaurri compensatory and punitive damages. Because we ultimately conclude that there was
insufficient evidence to support the jury's diligence determination, we will reverse the judgment
of the trial court. 

 

BACKGROUND

 On February 19, 2003, Vidaurri and Hull were involved in an automobile collision. 
As a result of the collision, Vidaurri later sued Hull for negligence. Vidaurri filed his petition around
the end of the two-year statute of limitations. (1) See Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a)
(West Supp. 2008) (explaining that in general, person must bring personal-injury claim within
two years of "day the cause of action accrues"). Although the case was filed near the end of the
limitations period, service of process was not successfully completed until approximately six months
after the statute of limitations had run. 

 After Hull was served, a trial ensued. Hull stipulated to ordinary negligence and to
property damage to Vidaurri's vehicle. After the parties rested, the jury awarded Hull compensatory
and punitive damages and specifically determined that Vidaurri had made diligent efforts to serve
Hull. Once the jury released its findings, Hull moved for a judgment notwithstanding the verdict,
arguing, in part, that there was no evidence that Vidaurri acted with the requisite level of diligence. 
The trial court denied the motion. In its judgment, although the trial court reduced the punitive
damage award in order to comply with the statutory cap, see Tex. Civ. Prac. & Rem. Code
Ann. § 41.008(b) (West 2008), the court awarded Vidaurri all of the remaining compensation
recommended by the jury. Hull appeals the judgment of the trial court. 


DISCUSSION

 On appeal, Hull contends, among other things, that the trial court erred by concluding
that Vidaurri had made diligent efforts to execute service of process because the evidence supporting
that determination is legally insufficient. When performing a legal-sufficiency analysis, courts must
determine whether the evidence presented would allow "reasonable and fair-minded people to reach
the verdict under review." City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). The evidence
presented is legally insufficient if the record shows "a complete absence of evidence of a vital fact,"
if "the evidence offered to prove a vital fact is no more than a mere scintilla," or if "the evidence
establishes conclusively the opposite of the vital fact." Id. at 810 (quoting Robert W. Calvert,
"No Evidence" & "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361 (1960)). Because
this issue is dispositive, we need not address the other arguments made by Hull. 

 It is undisputed that service was not performed until after the statute of limitations
had run. See Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a). To properly bring suit, a plaintiff must
file his petition and execute service of process on the defendant. Boyattia v. Hinojosa, 18 S.W.3d
729, 733 (Tex. App.--Dallas 2000, pet. denied). Filing a lawsuit, on its own, will not "avoid the
expiration of a statute of limitations." Id. When service is not performed until after the limitations
period has run, a plaintiff must justify the delay in service. See Proulx v. Wells, 235 S.W.3d 213,
215 (Tex. 2007). In other words, a plaintiff must present evidence concerning the efforts that he
made to serve the defendant and "to explain every lapse in effort or period of delay." Id. at 216. If
the delays are unexplained or "patently unreasonable," the evidence "may demonstrate a lack of due
diligence as a matter of law." Id.; see also Holt v. D'Hanis State Bank, 993 S.W.2d 237, 241
(Tex. App.--San Antonio 1999, no pet.) (stating that "unexplained delay constitutes a lack of due
diligence as a matter of law"). In other words, although a diligence determination is typically a fact
question, the record may establish a lack of diligence as a matter of law. Ashley v. Hawkins,
293 S.W.3d 175, 179 (Tex. 2009). Although the passage of time is an important factor to consider,
courts must also consider the "overall effort expended over the gap in service, and whether the
search ceased to be reasonable, especially when other methods of service were available." Id. at 181;
see Proulx, 235 S.W.3d at 216 (explaining that courts must consider how long it took plaintiff to
execute service and "the type of efforts . . . the plaintiff expended in procuring service"). If the
plaintiff did not exercise due diligence, "the lawsuit is deemed filed on the date of service." Holt,
993 S.W.2d at 241. When assessing whether the plaintiff exercised the requisite level of diligence,
courts must consider "whether the plaintiff acted as an ordinarily prudent person would have acted
under the same or similar circumstances and was diligent up until the time the defendant was
served." Proulx, 235 S.W.3d at 216; see Hodge v. Smith, 856 S.W.2d 212, 215
(Tex. App.--Houston [1st Dist.] 1993, writ denied). Moreover, the duty of due diligence is
continuous and extends until the date service is executed. Taylor v. Thompson, 4 S.W.3d 63, 65
(Tex. App.--Houston [1st Dist.] 1999, pet. denied). In analyzing these types of cases, courts must
bear in mind that it "is the responsibility of the party requesting service, not the process server to see
that service is properly accomplished." Id. 

 For the reasons discussed above, Vidaurri had the burden of demonstrating that he 
acted with due diligence in his attempts to serve Hull and of presenting evidence explaining the delay
in service. See Proulx, 235 S.W.3d at 215. 

 At the time this case was filed, Sara Parham was the lawyer at the law firm
representing Vidaurri with primary responsibility for the case. Much of the testimony relating to
service of process pertains to her efforts, but Parham did not testify. During the trial, three witnesses
testified regarding the efforts made to serve Hull. The first was an attorney, Chris Morgan, who had
been hired by Hull to represent him in an unrelated matter. In his testimony, Morgan explained that
his representation of Hull ended somewhere between the middle of April 2005 and May 1, 2005,
approximately two months after the lawsuit in this case was filed. The second witness was a process
server, Barbara Stinnet, who was hired by the law firm representing Vidaurri. The final witness was
Debra Foster, who was a legal assistant at the firm representing Vidaurri. 

 The testimony of Morgan and Stinnet revealed that there was a significant period of
time in which no steps were taken to execute service of process. In particular, their testimony
explained that the following events occurred in 2005: 



 February 25: Stinnet attempted to execute service at Hull's parents' home but
was told that he no longer lived there. However, Hull's parents did give
Hull's cell phone number to Stinnet


 


 February 26: Stinnet entered Hull's name into a database to try and find
another address at which to serve him


 


 February 28: Stinnet attempted to execute service at the address found in the
database but was told by the occupant that he had just moved in there and did
not know Hull


 


 March 1: Stinnet contacted the post office to determine if Hull was listed as
receiving mail at either of the locations at which she had attempted to execute
service 


 


 March 2: Stinnet called the number given to her by Hull's parents and left a
message


 


 March 3: Hull returned Stinnet's call and told her to send the documents to
Morgan


 


 March 3: Parham called Morgan and left a message stating that Hull asked
her to send the service documents to Morgan (2)


 


 March 4: Stinnet called Parham and left a message asking for further
instructions


 


 March 10: Stinnet called Parham (3) again because she had not heard from her. 
Regarding the conversation, Stinnet stated that she felt the service was "on
hold" because Parham had not decided how to proceed


 


 March 29: Morgan called Parham and told her that Hull had given him
permission to accept service on behalf of Hull. (4) During that conversation,
Morgan and Parham discussed the need for a rule 11 agreement (5) regarding
the service documents. Morgan stated that he never received the discussed
agreement or any process documents

 Sometime after March 29: Morgan received three phone calls regarding Hull,
but he testified that he did not know who made the calls or whether the same
person made all three calls. Regarding one of the calls, he stated that he
informed the caller that he no longer represented Hull and, therefore, could
not accept service for him. In his testimony, Morgan indicated that the
conversation described above occurred in the summer 


 


 April 22: Stinnet called Parham and left a message asking for an update


 


 Mid April to May 1: Morgan's representation of Hull terminated

 May 1-May 5: Stinnet received notice from the post office that Hull was still
listed as receiving mail at his parents' house but not at the second address
where Stinnet attempted to execute service


 


 May 1: Stinnet left a message for Parham stating that she had received
information from the post office showing that Hull was listed as actively
receiving mail at his parents' house

 Sometime on or before August 1: Stinnet received a phone call from a new
attorney at the firm Vidaurri hired. The attorney informed her that he had
taken over the case, and Stinnet told the new attorney that she believed that
Hull had agreed to allow Morgan to accept service on his behalf

 August 1: the new attorney called Stinnet and informed her that Morgan
would no longer accept service on behalf of Hull and instructed her that she
must now execute service in person


 


 Sometime between August 1 and August 5: Stinnet called Hull again and left
a message. Hull returned her call and gave her an address in Dallas for
delivery of the process documents 


 


 August 5: Stinnet mailed the documents to the address given to her by Hull


 


 August 25: The documents were returned to Stinnet as "undeliverable" (6)

 September 1: Vidaurri files a motion for substituted service (7)

 September 6: Stinnet executes substituted service at Hull's parents' home 




 The testimony of Stinnet and Morgan reveals that there was a significant lapse in
efforts to serve Hull starting in March. Although Parham left a message for Morgan in early March,
the testimony indicates that Parham made no follow up effort. Instead, Morgan called Parham
approximately three weeks later to discuss accepting service for Hull. Although Morgan testified
that he agreed to accept service for Hull, he stated that no service documents were ever sent. In light
of the preceding and in light of Vidaurri's burden to demonstrate his efforts in furtherance of service,
it is questionable whether the Morgan-initiated call could serve as evidence of diligence by Vidaurri. 
 Assuming for the sake of argument that Morgan's call on March 29 could properly
serve as evidence of diligence, the testimony summarized above reveals a four-month gap between
when Morgan agreed to accept service on behalf of Hull (March 29) and when a lawyer instructed
Stinnet to obtain a current address for Hull so that service of process could be executed in person
(August 1). Although Stinnet received information from the post office and made multiple calls to
Parham asking for further instructions, Stinnet did not engage in any efforts to serve Hull during that
time and was not given further instructions until August 1. In fact, in her testimony, Stinnet admitted
that from March 4 to August 1 she made no attempt to serve Hull, did not call Hull, and did not try
to ascertain his location. Moreover, she testified that it was her impression that "the papers were on
hold" and that the "hold" did not have anything to do with trying to ascertain where Hull was
staying. Furthermore, she testified that despite leaving several messages for Parham in March, April,
and May, no one from the firm returned her calls until several months later when the new attorney
called her and informed her that he had taken over the case. In addition, although Morgan did testify
that he only represented Hull for a few more weeks after informing Parham that he would accept
service for Hull, Morgan stated that no one ever sent him any process documents.

 As summarized above, Morgan and Stinnet mentioned several phone calls that they
received after the first gap was over. For some of the calls, Morgan and Stinnet provided the date
on which those calls were made, but they provided no specific chronological information regarding
four of the phone calls listed above. In particular, Morgan testified regarding three phone calls that
he received concerning Hull, and Stinnet mentioned a phone call from a new attorney at the firm
Vidaurri had hired. 

 Regarding two of the calls to Morgan, other than stating that the calls related to Hull,
Morgan provided no information about the calls and stated that he did not know who had made those
calls. In other words, he did not mention whether he actually talked with anyone or what, if
anything, was discussed during those calls. Accordingly, nothing in his testimony could serve as a
basis from which the jury could reasonably infer that those calls were made in furtherance of service
of process. Moreover, although Morgan intimated that those two calls occurred after he told Parham
that he would accept service for Hull, Morgan provided no information from which the jury could
determine if the calls occurred in the four-month gap, and no other evidence in the record makes any
reference to these calls. Richard v. Turner, No. 13-08-00015-CV, 2009 Tex. App. LEXIS 6973, at
*6-7 (Tex. App.--Corpus Christi Aug. 31, 2009, pet. filed) (mem. op.) (concluding that record
established lack of due diligence as matter of law and noting that plaintiff failed to provide specific
dates regarding service efforts); see also City of Keller, 168 S.W.3d at 813 (explaining that if
circumstances are equally consistent with two facts, neither may be inferred). 

 Regarding the other call, Morgan stated that he talked to someone and informed that
person that he no longer represented Hull and, therefore, could not accept service on behalf of Hull.
No specific date was given regarding when this call was made. It is worth noting that of the three
phone calls mentioned by Morgan, this is the only phone call for which Morgan provided testimony
relating to the furtherance of service of process. Although Morgan did not identify who the caller
for the third call was, in light of Stinnet's testimony, the jury could reasonably have inferred that the
caller was an attorney from the firm Vidaurri had hired. Specifically, Stinnet testified that she
received a phone call from a new attorney at the firm representing Vidaurri informing her that he was
taking over the case and that during that call, she informed the attorney that Hull had authorized
Morgan to accept service. From this testimony, the jury could reasonably infer that Morgan talked
to the new attorney. As with the call to Morgan, Stinnet provided no explanation regarding when
she received the call. 

 Although no date was given regarding either of the above calls, Stinnet also testified
that she received a second call from the new attorney on August 1, in which the attorney informed
her that Morgan would not accept service for Hull. In light of Stinnet's testimony regarding the
second call, the jury could reasonably have inferred that the two calls described above occurred
during the four-month gap. However, other than those two calls, the testimony summarized above
does not support an inference that any additional steps in furtherance of service of process were
made during the gap. 

 Moreover, the testimony of Stinnet revealed that despite the failed attempts to execute
service on Hull in February, no attempt to execute substituted service was attempted until six months
later in September. Cf. Carter v. MacFadyen, 93 S.W.3d 307, 314-15 (Tex. App.--Houston
[14th Dist.] 2002, pet. denied) ("A flurry of ineffective activity does not constitute due diligence if
easily available and more effective alternatives are ignored").

 The gap in service and the decision to forgo substituted service until late September,
if unexplained, would establish a lack of due diligence as a matter of law. See Proulx, 235 S.W.3d
at 216. Compare Ashley, 293 S.W.3d at 180-81 (Tex. 2009) (explaining that evidence that plaintiff,
over eight-month period, searched for defendant for 20 hours was insufficient as matter of law),
Mauricio v. Castro, 287 S.W.3d 476, 480 (Tex. App.--Dallas 2009, no pet.) (holding that defendant
was entitled to directed verdict when no evidence was admitted to explain thirty-one-day delay
between day statute of limitations expired and date of service), Mitchell v. Timmerman,
No. 03-08-00320-CV, 2008 Tex. App. LEXIS 9710, at *22 (Tex. App.--Austin Dec. 31, 2008,
no pet.) (mem. op.) (stating that four-month delay in serving defendant constituted lack of due
diligence as matter of law), Zimmerman v. Massoni, 32 S.W.3d 254, 256 (Tex. App.--Austin 2000,
pet. denied) (upholding jury determination that plaintiff was not diligent when he served defendant
four months after filing suit despite evidence that lapses between efforts to serve were relatively
small and despite repeated attempts at service in person and by alternative means), and Taylor, 4
S.W.3d at 65 (concluding that even though most of four-month delay in service occurred within
limitations period, failure to explain delay rendered case barred by statute of limitations), with
Proulx, 235 S.W.3d at 217 (determining that evidence of 30 attempts at service at five addresses over
eight-month period and of hiring of two process servers and two investigators was sufficient to create
fact issue regarding diligence), and Franklin v. Bullock, No. 03-07-00511-CV, 2008 Tex. App.
LEXIS 6239 (Tex. App.--Austin Aug. 14, 2008) (mem. op.) (concluding that there was fact issue
precluding summary judgment regarding diligence when evidence showed repeated attempts at
service at various residences over three-month period). (8)

 On appeal, Vidaurri attempts to explain the delay by referring to the testimony of
Foster. (9) During the trial, Foster stated that she worked for Parham--the attorney originally assigned
to this case--at the time this suit was filed. In her testimony, Foster admitted that she never had any
direct contact with Hull, Morgan, or Stinnet during the time period in question. Further, she testified
that during the relevant time period she was the assistant working on Vidaurri's file and explained
that her testimony was based in part on the notes in the file. (10) 

 In light of the preceding, Foster made several generalized statements regarding efforts
that had been made in furtherance of service of process. Specifically, she stated that her firm tried
to serve Hull several times, that the "attorneys" in the firm were trying to serve Hull, that "many
people" from the firm tried to call Hull "over many periods of time" but that Hull did not return any
of their calls, that Hull kept telling the firm to send the papers to Morgan, (11) that several attempts
were made to contact Morgan, and that Morgan said he could not contact Hull. See Richard,
2009 Tex. App. LEXIS 6973, at *6-7 (explaining that general statements regarding service attempts
do not establish due diligence). In addition, Foster explained that Parham "had to" have talked with
Stinnet about serving Hull because Parham was aware of the unsuccessful efforts Stinnet had made. 
Finally, she stated that the firm's in-house investigator unsuccessfully tried to track down Hull by
looking for evidence of a paper trail and that the firm attempted to determine Hull's address based
on his cell-phone number. (12) 

 However, Foster did not provide any dates or further details for any of these actions. 
See id. Importantly, Foster provided no testimony from which the jury reasonably could have
concluded that any of these actions occurred during the gap described previously, as opposed to
outside of it. See City of Keller, 168 S.W.3d at 813 (addressing equal inferences). For this reason
and in light of the burden on Vidaurri to explain all gaps and demonstrate his diligent efforts, her
general testimony that certain actions occurred at some time is not evidence that they occurred within
the allegedly improper gap. Accordingly, the testimony does not explain the lapse in service and
cannot establish whether Vidaurri was acting with the requisite level of diligence. By not
providing evidence of the dates of efforts toward service, Foster's testimony failed to prove
Vidaurri's diligence. 

 Moreover, Foster later clarified some of her more general testimony. For example,
although Foster originally stated that several attorneys and members of the firm were attempting to
execute service, she later admitted that the only attorney that she actually remembered making efforts
pertaining to serving Hull was Parham. Similarly, although Foster intimated that Parham was
communicating with Stinnet, Foster admitted that she could not remember any specific
communication between Parham and Stinnet and that Parham never informed her regarding any
conversation that she had with Stinnet. (13) 

 Although in a legal sufficiency review, courts may not substitute their opinion on
credibility "for those of the jurors," proper review "prevents jurors from substituting their opinions
for undisputed truth." Id. at 816-17. Foster's later testimony negated her prior general testimony,
and jurors could not disregard the admission that she only recalled Parham engaging in service 
efforts. See id. at 815 (explaining that when conducting legal sufficiency review, courts may not
ignore admissions that jury could not). 

 We also note that Foster gave no information regarding the amount of time that the
investigator spent trying to track down Hull or regarding the amount of effort exerted in attempting
to ascertain Hull's address by using his cell-phone number. Cf. Ashley, 293 S.W.3d at 180-81 at *12
(considering amount of time spent attempting to execute service when determining whether plaintiff
was diligent). (14)

 In addition to referring to Foster's testimony, Vidaurri also refers to the testimony of
Hull as an explanation for the lapse in service. In his testimony, Hull admitted that he was in jail
around the time that this case was filed, that he moved to Dallas after being released, that he lived
at various addresses while in Dallas, (15) and that he had several jobs while in Dallas. In light of that
testimony, Vidaurri urges that Hull's life at the time was nomadic in nature and that we should
consider this when determining whether Vidaurri was diligent in his efforts to serve Hull. 

 It is true that courts have considered evidence that a defendant has repeatedly changed
residences when determining whether service of process was diligently executed. For example, in
Proulx, the supreme court considered evidence that a defendant was actively avoiding service by
staying with various relatives. 235 S.W.3d at 217. However, the evidence was considered as part
of the explanation for why the plaintiff's 30 attempts to execute service of process at five residences
were unsuccessful. Id. at 215, 217. 

 In this case, no evidence was presented that any service attempt was made during the
four-month gap at issue. Due to the absence of evidence demonstrating efforts furthering service
during this gap, Hull's testimony cannot serve as an explanation for why service was not
accomplished. Moreover, we note that Stinnet testified that the delay in service was not due to an
inability to ascertain an address for Hull. 

 In light of the burden on Vidaurri to justify the delay in service and to demonstrate
that he acted with due diligence in attempting to serve Hull, we must conclude that the trial court
erred by determining that Vidaurri acted with the requisite level of diligence in attempting to serve
Hull because insufficient evidence was presented to explain the gap in service attempts. 
Accordingly, we sustain Hull's issue on appeal.


CONCLUSION

 Because the evidence regarding diligence was legally insufficient, we conclude that
Hull was entitled to a directed verdict in his favor. Therefore, we reverse the judgment of the
trial court and render judgment that Vidaurri take nothing from Hull. 



 

 David Puryear, Justice

Before Justices Patterson, Puryear and Pemberton

 Dissenting Opinion by Justice Patterson;

Reversed and Rendered

Filed: January 22, 2010
1. During the trial, Hull alleged that the petition was not filed until after the limitations period
had run. However, the jury determined that Vidaurri's petition was filed within the statutory
deadline. Hull does not challenge this determination on appeal. 
2. A written copy of the message was filed as an exhibit in this case. 
3. We note that in some of Stinnet's testimony, she refers to Vidaurri's firm rather than
Parham individually. 
4. Morgan's notes regarding the phone call were also submitted as an exhibit. 
5. See Tex. R. Civ. P. 11 (requiring agreement between attorneys or parties to be in writing
and to be signed and filed). 
6. In her testimony, Stinnet stated that after the service documents were returned, she made
two further attempts to contact Hull on the phone. Regarding the first attempt, she specified that she
called Hull and that when she was about to leave a message, he called her back. Further, she
explained that sometime after she answered his call, he asked to place her on hold and that she hung
up after being on hold for a minute or two. Regarding the second attempt, she stated that she tried
to call Hull back after hanging up on him but that her call went straight to his voicemail. Stinnet
could not recall whether she had left a message during the last phone call. 
7. See Tex. R. Civ. P. 106(b) (allowing service to be executed in manner other than by
delivering documents to person when attempts to serve person have been unsuccessful). 
8. Prior to oral argument in this case, Vidaurri filed a post-submission brief containing a
recent appellate decision. See Lawrence v. Geico Gen. Ins., No. 01-07-00873-CV, 2009 Tex. App.
LEXIS 5082 (Tex. App.--Houston [1st Dist.] July 2, 2009, no pet.) (mem. op.). In that case, the
court upheld a jury determination finding that Geico acted diligently in serving Lawrence even
though there was a gap of eight or nine months between when the case was filed and when service
was executed. Id. at *10-11. In light of that case, Vidaurri argues that he was acting diligently. 


 However, we believe Vidaurri's reliance on this case is misplaced. In Lawrence, although
the gap between the file date and service was longer than the delay in this case, there was no
unexplained gap as large as the one present in this case. When explaining the delay in service, Geico
showed that there was a delay in the first two months because the trial court did not issue the citation
until two months after Geico filed suit despite the fact that Geico specifically asked for immediate
citation. Id. at *3. Further, Geico presented evidence that during the third month its process server
attempted to serve Lawrence five times, repeatedly called Lawrence, and found eight potential
addresses for Lawrence. Id. at *3-4. Regarding the fourth and fifth months, Geico stated that it
attempted to execute service at the eight additional addresses. Id. at *4. Finally, Geico stated that
in the seventh month it filed a motion to serve Lawrence by publication, that the court granted the
request in the eighth month, and that the notice was published for four weeks starting in the ninth
month. Id. at *4-5. 
9. In her testimony, Foster discussed the actions Stinnet took to execute service of process
that we summarized above. 
10. We note that no portion of the file was admitted into evidence and that on appeal Hull
contends that the trial court erred by allowing in Foster's testimony because she had no personal
knowledge of the efforts made in furtherance of service on Hull. See Tex. R. Evid. 602 (explaining
that witness may not testify unless evidence is introduced showing that witness has personal
knowledge of subject). For the sake of argument, we will assume that the trial court did not err in
admitting Foster's testimony. 
11. In her testimony, Foster explained that Hull had instructed them to send the service
documents to Morgan, but later Foster stated that Stinnet was the one who told Parham to serve Hull
through Morgan. 
12. Foster also testified that Parham had made "at least two" phone calls to Morgan. 
Regarding those communications, Foster later stated that Parham had attempted to contact Morgan
"by the process server." 
13. As described earlier, Stinnet testified that although she left several messages for Parham, 
she had no communication with Parham after March 10 and that she left her last message for Parham
on May 1. In her testimony, Foster testified that she remembered seeing messages from Stinnet. 
14. In her dissent, Justice Patterson states that "the record is clear that the law firm's in-house
investigator was conducting auto track searches" during the four-month gap. However, nothing in
the record indicates when those efforts were made or how much effort was exerted. Accordingly,
the jury could not have reasonably inferred that the in-house investigator was attempting to locate
Hull during either gap previously discussed. 
15. In her testimony, Foster stated that Hull "had like five addresses at the time" and that "[h]e
was a very difficult puppy to serve."